1  KEVIN LAHUE, State Bar No. 237556

2     *klahue@kmbllaw.com*

3  KAYE, MCLANE, BEDNARSKI & LITT, LLP

4  234 East Colorado Boulevard, Suite 230

5  Pasadena, California 91101

6  Phone: (626) 844-7660

7  Fax: (626) 844-7670

8

9  BARRY SCHECK, State Bar No. 62646

10    *bcsinnocence@gmail.com*

11  NICK BRUSTIN,* NY Bar No. 2844405

12    *nick@nsbcivilrights.com*

13  ANNA BENVENUTTI HOFFMANN,* NY Bar No. 4412011

14    *anna@nsbcivilrights.com*

15  FARHANG HEYDARI,* NY Bar No. 5065693

16    *farhang@nsbcivilrights.com*

17  NEUFELD SCHECK & BRUSTIN, LLP

18  99 Hudson Street, 8th Floor

19  New York, NY 10013

20  Telephone: (212) 965-9081

21  Facsilimile: (212) 965-9084

22  *Awaiting Admission Pro Hac Vice*

23

24  Attorneys for Plaintiff

25  KASH DELANO REGISTER

26

27

28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KASH DELANO REGISTER, | **Case No.  14-cv-04568** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. Violation of Due Process and Fair Trial Rights** |
| The CITY OF LOS ANGELES, RICHARD ZOLKOWSKI, LEE KINGSFORD; GENE HUBENTHAL; MARTIN ZUBURI; GLEN BIER; G.W. HALLANGER, and JOHN DOES 1–10, in their individual capacities, | **2. Malicious Prosecution** |
| | **3. Civil Rights Conspiracy** |
| | **4. Supervisory Liability** |
| | **5. *Monell* Liability** |
| | **6. California Civil Code § 51.2** |
| | **7. Respondeat Liability** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff KASH DELANO REGISTER, by and through his attorneys, the law firms of Kaye, Mclane, Bednarski & Litt, LLP and Neufeld Scheck & Brustin, LLP, hereby alleges as follows:

## JURISDICTION

1.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the claims arising out of violations of the United States Constitution.

2.      Jurisdiction is conferred by 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

3.      This Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367(a).

## INTRODUCTION

4.      Plaintiff Kash Delano Register spent over 34 ½ years imprisoned for a crime he did not commit, the 1979 armed robbery and murder of an elderly white man in West Los Angeles.

5.      From the moment he was first arrested for this crime at age 18, Mr. Register consistently told anyone who would listen that he was innocent, that he had nothing to do with this murder, and did not know anything about it.  No forensic evidence ever linked the innocent black teen to the murder.

6.      Mr. Register's wrongful conviction was the result of intentional misconduct by the LAPD Detectives investigating the crime, who evidently cared more about convicting *someone* for this murder than about finding the true perpetrator.  Defendants used unconstitutional means—including coercion and direct suggestion—to obtain false identifications of Mr. Register from two separate

witnesses, even though Mr. Register had been nowhere near the crime scene.  The first, Brenda Anderson, had witnessed the murder but could not identify the perpetrator. The second, Elliot Singleton, had not witnessed the crime at all.

7.     Defendants then ensured Mr. Register's wrongful conviction by hiding evidence of his innocence from the prosecution and defense.  This included an emphatic statement from Brenda's sister, Sharon Anderson, that she had witnessed the crime and knew Mr. Register was *not* the perpetrator, as well as evidence of the threats, coercion, suggestion and other influence Defendants had used to procure the false identifications.

8.     But for the extraordinary efforts of a stranger—Sheila Vanderkam, Brenda and Sharon Anderson's sister—Mr. Register would still be in prison today.

9.     Ms. Vanderkam, who had been a low-level employee of the LAPD in 1979, told lead LAPD Detective Richard Zolkowski at the time that she knew that Brenda Anderson's alleged identification of Mr. Register was false, and that her sister was a liar.  In response, Det. Zolkowski put one finger up to his lips and instructed Ms. Vanderkam to "shhh."  Ms. Vanderkam, fearing for her job and career, complied with the direction of her superior not to mention this again.  Defendants never told the prosecution or defense of this exculpatory information, either.

10.    Over 30 years later, Ms. Vanderkam happened to learn that Mr. Register had nevertheless been convicted and was still imprisoned.  Having never forgotten his unusual name, she knew at once this was the man she had told Defendants was innocent so long ago.  She felt compelled to act to free him.

11.    With the assistance of a paralegal, Keith Chandler, Ms. Vanderkam collected evidence of Mr. Register's innocence—and the buried LAPD misconduct that had caused his wrongful conviction—that would form the basis for a habeas

petition.  The court later appointed lawyer Herbert Barish and the Loyola Law School Project for the Innocent in Los Angeles to represent Mr. Register.

12.     After extensive evidentiary hearings, on November 7, 2013, the court granted Mr. Register's habeas petition and vacated his conviction, expressly crediting the testimony of Sharon Anderson and Sheila Vanderkam and holding that Mr. Register was "denied due process of law and was denied a fair trial."

13.     Mr. Register was finally released on November 8, 2013, 34 years and 7 months after he was first incarcerated.  The District Attorney's Office dismissed the charges against him a month later.

14.     The LAPD misconduct that caused Mr. Register's wrongful conviction is shocking.  But unfortunately, it was not unusual.  Rather, it was emblematic of the deliberate indifference the LAPD customarily displayed towards the constitutional rights of the citizens of Los Angeles—particularly those of young black men.

15.     As noted by several independent investigations of the LAPD, including the Christopher Commission's 1991 Report, the LAPD maintained unconstitutional customs, policies, patterns, and practices of failing to control, supervise, and discipline its officers, thereby emboldening the officers to engage in unconstitutional misconduct.  As evident in this case, and as explained by the Christopher Commission, "the greatest single barrier" to guarding against such unconstitutional misconduct was "the officers' unwritten code of silence: an officer does not provide adverse information against a fellow officer."

16.     As a result of this pattern of misconduct in the 1970s and 80s, Mr. Register joined Clarence Chance, Benny Powell, Adam Miranda, Willie Earl Green, Bruce Lisker, Geronimo Pratt, Timothy Atkins, Ricky Evans, Harold Hall, Arthur Grajeda, Senon Grajeda, Gerald Atlas, and Andre Taylor, as one in a long line of wrongful convictions in LA.  Of these numerous wrongful-convictions, Mr. Register has the unfortunate distinction of being wrongfully incarcerated for the longest

1  period of time.

2  **VENUE**

3      17.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Central District

4  of California, the judicial district in which the claims arose and in which the

5  Defendants conducted business.

6  **PARTIES**

7      18.    Plaintiff KASH DELANO REGISTER is, and at all times relevant

8  herein was, an individual residing in the State of California, County of Los Angeles.

9  On October 31, 1979, Mr. Register was wrongfully convicted of murder in the first

10  degree, and subsequently wrongfully incarcerated in the California Department of

11  Corrections.

12      19.    Defendant CITY OF LOS ANGELES is, and at all times relevant

13  herein was, a public entity existing in the state of California. At all times relevant to

14  this action, the Los Angeles Police Department is and was part of the City of Los

15  Angeles.

16      20.    Defendant RICHARD ZOLKOWSKI is a former resident of the State

17  of California and of this judicial district and is a current resident of the State of

18  Nevada. At all relevant times herein, Zolkowski was a LAPD Detective acting under

19  color of law and in his individual capacity within the scope of employment pursuant

20  to the statutes, ordinances, regulations, policies, customs, and usage of the City of

21  Los Angeles and the State of California. Zolkowski was part of the

22  Robbery/Homicide detective team assigned to investigate Mr. Sasson's murder.

23      21.    Defendant LEE KINGSFORD is a resident of the State of California

24  and of this judicial district. At all relevant times herein, Kingsford was a LAPD

25  Detective acting under color of law and in his individual capacity within the scope

26  of employment pursuant to the statutes, ordinances, regulations, policies, customs,

27  and usage of the City of Los Angeles and the State of California. Kingsford was part

28

6

1  of the Robbery/Homicide detective team assigned to investigate Mr. Sasson's

2  murder.

3       22.     Defendant GENE HUBENTHAL is a resident of the State of California

4  and of this judicial district. At all relevant times herein, Hubenthal was a LAPD

5  Officer acting under color of law and in his individual capacity within the scope of

6  employment pursuant to the statutes, ordinances, regulations, policies, customs, and

7  usage of the City of Los Angeles and the State of California.

8       23.     Upon information and belief, Defendant MARTIN ZUBURI is a

9  resident of the State of California and of this judicial district. At all relevant times

10 herein, Zuburi was a LAPD Officer acting under color of law and in his individual

11 capacity within the scope of employment pursuant to the statutes, ordinances,

12 regulations, policies, customs, and usage of the City of Los Angeles and the State of

13 California.

14      24.     Upon information and belief, Defendant GLEN BIER is a resident of

15 the State of California and of this judicial district. At all relevant times herein, Bier

16 was a LAPD Detective acting under color of law and in his individual capacity

17 within the scope of employment pursuant to the statutes, ordinances, regulations,

18 policies, customs, and usage of the City of Los Angeles and the State of California.

19 Bier was the supervisor of the Robbery/Homicide detective team assigned to

20 investigate Mr. Sasson's murder.

21      25.     Upon information and belief, Defendant G.W. HALLANGER is a

22 resident of the State of California and of this judicial district. At all relevant times

23 herein, Hallanger was a sergeant in the LAPD acting under color of law and in his

24 individual capacity within the scope of employment pursuant to the statutes,

25 ordinances, regulations, policies, customs, and usage of the City of Los Angeles and

26 the State of California.

27

28

26.     Defendants JOHN DOES 1–10, upon information and belief, are residents of the State of California and of this judicial district. At all relevant times herein, John Does were LAPD officers acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Los Angeles and the State of California.

27.     Officer Defendants ZOLKOWSKI, KINGSFORD, HUBENTHAL ZUBURI, BIER, HALLANGER, and JOHN DOES 1–10, as members of the LAPD, were employed by the City of Los Angeles, and were acting under color of law within the scope of their employment at all times relevant herein. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### JACK SASSON IS ROBBED AND MURDERED

28.     At approximately 12:30 p.m. on April 6, 1979, Jack Sasson, a seventy-nine year-old white man, left his home at 1937 South Shenandoah Street in Los Angeles, California, and headed toward his car, which was parked in his home's carport.

29.     Mr. Sasson's wife, Renee Sasson, remained inside.

30.     As Mr. Sasson sat inside his car, he was attacked by a single African-American male perpetrator.

31.     The perpetrator shot at Mr. Sasson multiple times, robbed him of his wallet, and fled the scene on foot.

32.     The bullets struck Mr. Sasson five times, causing him to slump over onto the horn of the car.

33.     When Renee Sasson heard the blow of the horn, she came down to the carport and found Mr. Sasson lying on the seat of the car.

34.     Mr. Sasson, the car, and the floor of the carport were covered in blood.

35.     Following the attack, Mr. Sasson was hospitalized and remained in critical condition until his death, three weeks later, on April 27, 1979.  He never regained the ability to speak.

**MULTIPLE INDIVIDUALS WITNESS THE CRIME**

**Brenda Anderson and Sharon Anderson**

36.     On the day of the crime, Brenda Anderson and Sharon Anderson, ages eighteen and seventeen respectively, lived with their mother, Christine Chambers, and two of their siblings in an apartment at 1954 Shenandoah, which was across the street and three buildings down from 1937 Shenandoah, where the Sassons lived.

37.     Brenda was known in the family and the community as a compulsive liar and drug addict.

38.     At the time of the shooting, Brenda was facing credit card forgery charges stemming from an arrest that had occurred a week earlier on March 31, 1979.

39.     On the morning of Mr. Sasson's shooting, Brenda and Sharon stole a package of Avon products from a neighbor's porch.  They intended to sell the Avon products to a friend who lived on the opposite side of Shenandoah.

40.     Brenda and Sharon took the stolen Avon products across Shenandoah to the friend's apartment and left the products there.

41.     As they left the friend's apartment to return to 1954 Shenandoah, Brenda and Sharon heard what turned out to be gunshots, followed seconds later by the sound of a car horn, coming from the Sasson residence.

42.     When they looked over toward the Sasson residence, they saw the perpetrator standing over Mr. Sasson's car and Mr. Sasson slumped over the wheel.

43.     The girls then ran across Shenandoah, back to their apartment.

**Patty Singleton and Elliot Singleton**

44.     On the day of the crime, Patty Singleton (now known as Patty Singletary), and her husband, Elliot Singleton (now known as James Singletary), were inside a residence located at 1940 Shenandoah, which is across the street from the Sasson residence.

45.     On the morning of the crime, Elliot Singleton was painting inside 1940 Shenandoah.

46.     Patty Singleton was also home; she was pregnant and not working.

47.     At around 12:30 p.m., Patty Singleton heard gunshots coming from the Sasson carport. She looked out of the window and saw the perpetrator fleeing the scene.

48.     Elliot Singleton did not see any part of the incident, and thus could not make any proper identification of the perpetrator.

### MR. REGISTER IS NOWHERE NEAR THE CRIME

49.     Mr. Register was not involved in any way with the armed robbery and shooting of Mr. Sasson.

50.     On April 6, 1979, the day of the crime, Mr. Register was 18 years old and living with his mother, Wilma Register, and older brother, Norman Register, in an apartment at 2035 Garth Avenue in West LA.

51.     Mr. Register's girlfriend was pregnant, and Mr. Register was actively looking for work.

52.     At around 10:00 or 10:30 a.m. on the morning of April 6, Mr. Register arrived at the office of Dorothy McEntire, an Employment Program Representative at the State of California Employment Development Department in the Culver City Office. Ms. McEntire was helping Mr. Register find a job.

53.    On April 6, unlike Mr. Register's previous appointments, Ms. McEntire had good news: She had found Mr. Register a job.  She told Mr. Register to call her back later that afternoon to schedule an interview.

54.    After leaving Ms. McEntire's office around 11:00 or 11:30 a.m., Mr. Register spent time with his girlfriend, and his girlfriend's mother.

55.    When Mr. Register called Ms. McEntire as scheduled that afternoon, she provided him with the name of the employer and informed him that he had an interview the next day, Saturday, April 7, 1979. Ms. McEntire noticed nothing at all unusual in Mr. Register's voice and felt that Mr. Register was sincere about looking for a job.

56.    The following morning, Mr. Register woke up excited for his job interview. He spoke to the employer on the phone, who instructed him to come to Venice that afternoon. Mr. Register kept the appointment and was hired.

57.    Monday, April 9, 1979, was Mr. Register's first and last day of work. He was arrested in the early morning of April 10, 1979, and would remain incarcerated for the next 34 years.

**THE LAPD'S INITIAL INVESTIGATION REVEALS NO SUSPECTS**

58.    On April 6, 1979, Hubenthal and Zuburi were patrol officers assigned to the West LA Division of the LAPD. Defendants Kingsford and Zolkowski were detectives assigned to that same division.

59.    Around 12:45 p.m., Hubenthal and Zuburi were the first officers to respond to a report of a shooting on Shenandoah. They arrived to find a great deal of blood all over the carport, and Mr. Sasson being treated by EMS personnel.

60.    By the time Hubenthal and Zuburi arrived, there were about 20 to 25 people standing around the scene of the crime.

61.    Hubenthal interviewed many of these individuals, and approximately six indicated that they were eyewitnesses to the crime.

62.     Hubenthal did not record the name of each of the eyewitnesses, nor did he initially report speaking to each of the witnesses.

63.     Hubenthal reported speaking to only four witnesses: Elliott Singleton, Brenda Anderson, Sharon Anderson, and Christine Chambers (Brenda and Sharon's mother).

64.     Rather than list individual statements and suspect descriptions from each witness, as was proper police procedure, Hubenthal reported a composite description of the perpetrators compiled from all of the interviews.

65.     As indicated in Hubenthal's contemporaneous report, none of the witnesses interviewed by Hubenthal identified Mr. Register or anyone else as the perpetrator.

66.     Hubenthal, Zuburi, and other officers checked the scene and the surrounding area, but did not find the murder weapon.

67.     Kingsford and Zolkowski, detectives from the West LA Division, subsequently arrived on the scene. They spoke with the officers on the scene and spoke to witnesses.

68.     Zolkowski reported speaking only to Elliott Singleton.

69.     By around 2:00 p.m., a LAPD criminalist, arrived on scene.  He obtained physical evidence, including a number of .32 caliber brass casings, and took a number of photographs.

70.     A latent fingerprint examiner with the LAPD's Scientific Investigation Division dusted Mr. Sasson's car for prints.  He dusted the outside of the car on the driver's side, the window on the driver's side, and the inside rearview mirror.  The fingerprint examiner was able to lift seven prints.

71.     Mr. Register would ultimately be excluded as the source of these prints.

72.     By the end of April 6, 1979, the Defendant Officers did not have any suspects in the crimes against Mr. Sasson.

## OFFICER DEFENDANTS OBTAIN BRENDA ANDERSON'S
## FALSE IDENTIFICATION

73.     At some point after the shooting and before April 9, 1979, it was reported to the LAPD that Brenda and Sharon had stolen Avon products from Shenandoah Street.

74.     This in turn became known to Defendants, including Defendants Zolkowski and Kingsford, who were assigned to be the lead investigators into Mr. Sasson's murder.

75.     Defendants also knew that, according to Defendant Hubenthal's report, Brenda and Sharon had witnessed the crimes against Mr. Sasson.

76.     On Monday, April 9, 1979, three days after the crime, officers from the West LA Division, at the direction of Defendants Zolkowski and Kingsford, went to 1954 Shenandoah to bring Brenda and Sharon to the station.  The pretextual reason given for bringing Brenda and Sharon down to the station was to discuss the Avon theft.

77.     At the station, Brenda and Sharon were separated from one another and questioned by Defendants Zolkowski and Kingsford.

78.     Upon information and belief, prior to questioning Brenda and Sharon, Defendants, without adequate factual basis or probable cause, obtained Mr. Register's photograph and included it in a photo array.

79.     Zolkowski and Kingsford first questioned Brenda. At the onset of their questioning, Brenda Anderson made clear that she could not positively identify the perpetrator. Zolkowski and Kingsford did not document Brenda's inability to identify the perpetrator, and did not report this fact to either Mr. Register's defense counsel or the prosecutors.

80.     Upon information and belief, Zolkowski and Kingsford, however, threatened to prosecute Brenda for the credit card forgery or for her role in the Avon

1   theft if she failed to make an identification, and also promised to forgo prosecution

2   of either of those crimes if Brenda followed their instructions and made an

3   identification.

4          81.     In exchange for dropping the Avon prosecution, Brenda followed

5   Zolkowski and Kingsford's instruction and selected Mr. Register's photo from a

6   photo array.  Also at Zolkowski and Kingsford's direction, Brenda wrote on the

7   back of the picture that she recognized Mr. Register as the perpetrator of the crimes

8   against Mr. Sasson.

9          82.     Brenda's identification was false and would not have been obtained but

10  for Defendants coercion, threats of prosecution, and promises of leniency, none of

11  which was ever disclosed to either Mr. Register's defense counsel or to the

12  prosecution.

13         83.     Brenda was ultimately never prosecuted for either the credit card

14  forgery or the Avon theft.

15         **OFFICER DEFENDANTS COERCE SHARON ANDERSON**

16         84.     Having obtained Brenda's tainted identification, Defendants turned to

17  Sharon for corroboration.

18         85.     Defendants showed Sharon the same photo array that included Mr.

19  Register's photograph. Mr. Register's photo was the only photo with a circle drawn

20  around it.

21         86.     Zolkowski and Kingsford told Sharon that Brenda had already

22  identified Mr. Register as the perpetrator.  Sharon told the detectives that Mr.

23  Register was not the man she had seen standing over Mr. Sasson's car.  At that

24  point, the detectives threatened to send Sharon to juvenile hall for a long time for

25  her involvement in the Avon theft.

26         87.     Despite Defendants' threats, coercion, and suggestion, Sharon refused

27  to identify Mr. Register as the perpetrator.  In fact, Sharon continued to insist to

28

14

Zolkowski and Kingsford that she had seen the perpetrator, and that she knew Mr. Register was not the perpetrator.

88.     Sharon was particularly certain that Mr. Register was not the perpetrator because she knew Mr. Register from the neighborhood and from seeing him on the occasions that she visited Hamilton High School.

89.     Rather than accept or document Sharon's insistence that Mr. Register was not the shooter, Zolkowski and Kingsford responded with threats and coercion. They told Sharon that if she did not identify Mr. Register, she would be prosecuted for the Avon theft and would spend a "very long time" in Juvenile Hall.

90.     Sharon steadfastly maintained that Mr. Register was not the perpetrator.

91.     After several more attempts to pressure Sharon into changing her story, Defendants eventually released her.

92.     Defendants never memorialized Sharon Anderson's exculpatory statements or refusal to identify Mr. Register as the perpetrator.  Defendants never disclosed this exculpatory information to either the prosecutors or to defense counsel.

93.     Ultimately, in exchange for Brenda's tainted identification, neither Sharon nor Brenda was ever charged with the Avon theft.  This fact was concealed from the defense and the prosecution.  The Officers Defendants falsely reported that Brenda had positively identified Mr. Register on her own.

94.     Upon information and belief, Zolkowski and Kingsford's actions with regard to Brenda and Sharon Anderson were known or should have been known to their supervisors, including Defendants Bier, Hallanger, and John Does 1–10, who supervised the Robbery/Homicide detectives, including Zolkowski and Kingsford.

**MR. REGISTER IS ARRESTED**

95.     Based solely on Brenda Anderson's coerced and false identification, Kingsford prepared an affidavit in support of a search and arrest warrant for Mr.

Register. Defendants obtained the warrants and executed them during the early hours of April 10, 1979.

96.   At around 7:00 a.m. on the morning of April 10, 1979, Mr. Register was preparing to leave the house for his second day of work at the job that he had secured just a few days earlier.

97.   At approximately 7:00 a.m., Zolkowski and Kingsford, and approximately four other officers executed the search warrant at Mr. Register's home. The officers arrested Mr. Register and seized some clothing from his closet.

98.   The search revealed no firearm, wallet, or any other evidence tying Mr. Register to the crime scene.

99.   At the time of his arrest, Mr. Register truthfully denied any knowledge of or involvement with the crime.

**OFFICER DEFENDANTS FABRICATE ELLIOT SINGLETON'S FALSE IDENTIFICATION**

100.   Elliot Singleton never witnessed Mr. Sasson's murder and did not see the perpetrator.

101.   The initial story that Elliot Singleton provided to Defendants on the day of Mr. Sasson's murder was incredible on its face.

102.   Elliot Singleton claimed that he chased the armed perpetrator through the streets of LA after seeing him rob and shoot Mr. Sasson multiple times.  Elliot Singleton claimed that the chase took ten minutes and that, even though he was at running full speed the entire time, he never broke a sweat, lost his breath, or felt any fear.

103.   In 2013, Elliot Singleton testified at Mr. Register's habeas hearing and denied having any memory of Mr. Sasson's murder, of identifying Mr. Register as the perpetrator, or of testifying against Mr. Register at trial. Elliot Singleton did

testify that his account of chasing the suspect on foot did not sound like something he would do and sounded "crazy."

104.    Following Mr. Register's arrest, Defendants Zolkowski and Kingsford turned to Elliot Singleton for corroboration.

105.    Elliot Singleton and Mr. Register did not know each other, and had never met, when Zolkowski and Kingsford approached Elliot Singleton.

106.    Nevertheless, and although Elliot Singleton did not witness the crime, Zolkowski and Kingsford obtained from Elliot Singleton a false positive-identification of Mr. Register, the man that Zolkowski and Kingsford were wrongly prosecuting for Mr. Sasson's murder.

107.    Upon information and belief, Zolkowski and Kingsford used unconstitutionally suggestive identification procedures, coerced, or outright fabricated Elliot Singleton's identification of Mr. Register.

108.    Upon information and belief, Zolkowski and Kingsford's actions with regard to Elliot Singleton were known or should have been known to their supervisors, including Defendants Bier, Hallanger, and John Does 1–10, who supervised the Robbery/Homicide detectives, including Zolkowski and Kingsford.

**OFFICER DEFENDANTS INTENTIONALLY SUPPRESS SHEILA VANDERKAM'S EXCULPATORY INFORMATION**

109.    In addition to: (i) obtaining Brenda Anderson's tainted identification, (ii) suppressing Sharon Anderson's exculpatory statement that Mr. Register was not the perpetrator, and (iii) coercing, fabricating, and/or suggesting Elliot Singleton's identification of Mr. Register, Defendants also suppressed exculpatory information from Brenda and Sharon's older sister, Sheila Vanderkam.

110.    At the time of the Sasson murder, Ms. Vanderkam was twenty-six years old. She did not live with her family at 1954 Shenandoah, but visited often.

111.   Ms. Vanderkam was employed by the LAPD as a Crime Prevention Assistant in the West LA Division of the LAPD. Ms. Vanderkam wanted to become a police officer herself and viewed her job as a stepping-stone toward achieving that goal.

112.   At the time of the Sasson murder, Ms. Vanderkam reported directly to the detectives assigned to the Sasson investigation, including Defendants Zolkowski and Kingsford.

113.   Ms. Vanderkam was not present when Mr. Sasson was robbed and shot, but when she arrived at 1954 Shenandoah later that evening, she discussed the shooting with her family.  Based on her conversations with her sisters, Ms. Vanderkam learned that Brenda was on the street at the time of the crime, but could not identify the perpetrator.

114.   The next week, following Mr. Register's arrest, Ms. Vanderkam went to work at the station.  She was approached by Defendant Zolkowski, who told her that her sister, Brenda, had witnessed the crime.

115.   Following that encounter with Zolkowski, Ms. Vanderkam again spoke with Brenda, who reported to Ms. Vanderkam that she had never identified a suspect to Zolkowski and in fact had told him that she never saw the perpetrator's face.

116.   After this conversation with her sister, during which Brenda was clear that she could not identify the perpetrator, Ms. Vanderkam felt that it was important for her to again speak to Zolkowski, which she did.

117.   Ms. Vanderkam reported to Zolkowski that Brenda had witnessed the crime from the street but could not positively identify the perpetrator.  She also told Zolkowski that Brenda had a history of lying, had a significant criminal history, and generally could not be trusted.

118.   When Ms. Vanderkam reported this exculpatory information, Zolkowski placed his finger over his mouth (like a "shhh" sound) and stared at Ms.

1  Vanderkam.  Zolkowski made it completely clear that Ms. Vanderkam was to

2  remain quiet, then and forever.

3      119.   Consistent with his direction to Ms. Vanderkam, Zolkowski made no

4  record of Ms. Vanderkam's exculpatory information.  This information was not

5  disclosed until over 30 years later, during Mr. Register's habeas case.

6      120.   Ms. Vanderkam, as a young, black, female, low-level employee,

7  reasonably feared for her job and her future career, and therefore followed the clear

8  direction of her supervisor, Zolkowski, and did not bring up this exculpatory

9  information again.

10     121.   Zolkowski never disclosed Ms. Vanderkam's statement to either the

11 prosecutors or Mr. Register's defense counsel.

## FORENSIC TESTING DOES NOT CONNECT MR. REGISTER TO
## MR. SASSON'S MURDER

14     122.   At some point following Mr. Register's arrest, a latent fingerprint

15 investigator at the Scientific Investigation Section of the LAPD examined the latent

16 prints lifted from the scene of Mr. Sasson's murder and compared those prints with

17 ones obtained from Mr. Register.

18     123.   The examiner concluded that the prints obtained from the murder scene

19 did not match Mr. Register's prints.

20     124.   Upon information and belief, Defendants did not request that the

21 examiner compare the latent prints with known prints from Mr. Sasson or Mrs.

22 Sasson in order to avoid the possibility that the latent prints might indicate they had

23 the wrong suspect.

24     125.   Despite conducting a search of Mr. Register's residence on April 10,

25 1979, and obtaining various items of physical evidence, including clothing,

26 Defendants did not request forensic testing be conducted on this evidence until

27 August of 1979.

28

126.   On August 16, 1979, a criminalist employed by the LAPD's Scientific Investigation Division picked up pants obtained from Mr. Register's apartment for blood testing.  The testing was completed on August 21, 1979.

127.   The criminalist reported finding a single a spot of blood on the pants, so small that it was not observable to the naked eye.  This single drop of blood stood in stark contrast to the massive amount of blood found at the scene of Mr. Sasson's murder.

128.   The criminalist reported performing one blood-typing test, which used up the blood evidence.  The criminalist reported that the test showed that the blood was Type O.

129.   Type O blood is the most common blood type.

130.   Mr. Register, Mr. Sasson, approximately 3.2 million Los Angeles County residents at the time, and about 45 percent of Americans have Type O blood.

131.   Because the criminalist's tests reportedly consumed the tiny spot of blood found on Mr. Register's pants, there was nothing left for a defense expert to test to confirm or dispute the LAPD criminalist's findings.

**MR. REGISTER IS WRONGFULLY CONVICTED**

132.   Mr. Register was originally charged with assault with the intent to commit murder. After Mr. Sasson died of his injuries on April 27, 1979, Mr. Register was indicted for first-degree murder.

133.   The Los Angeles District Attorney's Office considered seeking the death penalty against Mr. Register, but decided not to prior to trial.

134.   Mr. Register's jury trial began on October 19, 1979.

135.   At trial, Brenda Anderson and Elliot Singleton falsely identified Mr. Register as Mr. Sasson's killer.  Both Mr. Register's defense counsel and the prosecutors were unaware of how Defendants had improperly influenced these identifications.

136.   Mr. Register's defense counsel was also unaware that either Sharon Anderson or Patty Singleton had witnessed the crime, or that Sharon Anderson and Sheila Vanderkam had told Defendants that Mr. Register was not the perpetrator.

137.   Accordingly, the defense case focused on the complete lack of forensic evidence against Mr. Register and Mr. Register's numerous alibi witnesses, including Ms. Dorothy McEntire.

138.   Even with Defendants' fabrications and suppression of exculpatory evidence, the all-white jury took three days to reach a verdict.

139.   On October 31, 1979, Mr. Register was convicted of first-degree murder, of committing the murder while engaged in the commission of a robbery, of using a firearm to commit the offense, and of inflicting great bodily injury on a victim over the age of 60.

140.   On December 14, 1979, Mr. Register was sentenced to life without the possibility of parole.

## MR. REGISTER MAINTAINS HIS INNOCENCE
## THROUGHOUT HIS INCARCERATION

141.   From the moment that he was arrested, Mr. Register has always insisted that he had nothing to do with Mr. Sasson's murder.

142.   When the jury returned its guilty verdict, Mr. Register stated in open court, "I did not do nothing."

143.   After his original sentence of life without the possibility of parole was changed to 25 years to life, Mr. Register became eligible for parole in 1993.

144.   Since that time, he appeared before the parole board eleven times. At each parole hearing, Mr. Register maintained his innocence.

145.   At his May 9, 2002 parole-board hearing, Mr. Register told the parole board: "[T]hat's all I can do, you know. That['s] all I can do and just hope that, you know, you can see that I'm an innocent man."

146.   At his May 22, 2003 parole-board hearing, Mr. Register told the parole board: "I'm not the person who did the crime."

147.   At his May 18, 2007 parole-board hearing, Mr. Register told the parole board: "I will not admit to a crime that I had no involvement in or no knowledge of to satisfy someone's desire.  There has been a mistake here, and no one wants to correct it."

148.   At his April 12, 2012 parole-board hearing, Mr. Register told the parole board: "I just know that a mistake was made, and my thinking was to try to show there was a mistake made and, you know, get my freedom back."  He added: "I've been incarcerated for 33 years of my life for a crime I did not commit."

149.   The parole board repeatedly used Mr. Register's insistence on his innocence as part of its reasoning to deny him parole.

150.   Mr. Register was well aware of this fact; at his final parole hearing, he said as much to the board:  "It appears that the only reason that I have been consistently denied parole is because I have maintained my innocence."

151.   Despite Mr. Register's impossible position—being denied parole for failing to admit responsibility for a crime that he did not commit—Mr. Register was a model prisoner.  He obtained his high school diploma and completed numerous vocational programs, all with a near-perfect disciplinary record for nearly 34 years.

## MR. REGISTER IS EXONERATED

152.   In late 2011, about 33 years after Mr. Register's conviction, Ms. Vanderkam came upon the prison locator website for the California Department of Corrections while surfing the internet.  She lingered at the site, looking up various people she knew.  Luckily for Mr. Register, Ms. Vanderkam remembered his unique name and looked him up.  She was shocked to discover that he was still incarcerated. Ms. Vanderkam felt compelled to act.

153.   Through her own research, Ms. Vanderkam contacted Steven Sanders, an attorney who had represented Mr. Register in a prior habeas case. Mr. Sanders's paralegal assistant was Keith Chandler.

154.   Together, Mr. Chandler and Ms. Vanderkam secured declarations from Ms. Vanderkam, Sharon Anderson, and others, and filed a petition for habeas corpus on Mr. Register's behalf.

155.   Mr. Register played no role in shaping the declarations or encouraging the witnesses to come forward.

156.   Los Angeles County Superior Court Judge Katherine Mader received the petition and, after reading it, appointed attorney Herbert Barish to represent Mr. Register in October 2012.  Within a few weeks, Mr. Barish joined with the Loyola Law School Project for the Innocent in Los Angeles to investigate Mr. Register's case.

157.   After months of additional investigation by both Mr. Register's new counsel and by the prosecution, the Superior Court of the State of California for the County of Los Angeles held days of evidentiary hearings.

158.   At the habeas hearing, Ms. Vanderkam testified regarding her conversation with Defendant Zolkowski that Brenda Anderson's identification of Mr. Register should not be believed because she was a drug addict and a liar.  She testified that Zolkowski simply told her to "shhhh."  The Court found her testimony to be "credible and supported by several other witnesses," including Sharon Anderson, who testified that she had witnessed the shooting, that Mr. Register was not the perpetrator, and that when she told Defendants this, they threatened her with prosecution and imprisonment.

159.   Both Brenda Anderson and Elliot Singleton testified at the hearing, and neither identified Mr. Register as the perpetrator.

23

160.   At the hearing, Elliot Singleton, aka James Singletary, claimed to have no memory of Mr. Sasson's murder, of identifying Mr. Register as the perpetrator, or testifying against Mr. Register at trial.  Elliot Singleton admitted that his account of chasing the suspect on foot was "crazy."

161.   At the hearing, Brenda Anderson was an especially incredible witness. The prosecutor called her "a complete mess," "one of the worst witnesses I have ever seen," a "complete flake," and a "loon."  She did testify, however, that she never identified Mr. Register as the perpetrator to the police.

162.   None of the physical evidence from the crime scene, including the clothing, caps, photo arrays, fingerprint evidence, and shell casings, was presented at the hearing because, according to the LAPD, all of the evidence had been lost or destroyed.

163.   The LAPD claimed that it could find only an empty envelope labeled as containing the fingerprints lifted from Mr. Sasson's car.

164.   On November 7, 2013, Judge Mader granted Mr. Register's petition and vacated his conviction, finding that Mr. Register had been denied due process of the law and was denied a fair trial.

165.   The Court explained: "This Court does not have confidence in the integrity of the verdict and believes that the jurors, had they known about the *Brady* evidence, would have seen the evidence in a completely different light."

166.   Mr. Register was released on November 8, 2013.

167.   The prosecution dismissed the charges on December 13, 2013.

## THE FAILURE OF THE DEFENDANT CITY OF LOS ANGELES TO PROPERLY TRAIN, SUPERVISE, AND DISCIPLINE

168.   The unconstitutional and tortious acts of the Defendant Officers were not isolated incidents.  Upon information and belief, there was a custom, policy,

1  pattern and practice in the City of Los Angeles beginning years before the unjust

2  conviction of Mr. Register and continuing throughout his incarceration, of

3  condoning, encouraging, ratifying, and acquiescing in the practice of failing to

4  conduct reasonable criminal investigations, conducting unconstitutional

5  interrogations, fabricating evidence including evidence supporting probable cause,

6  committing perjury, failing to investigate alibi evidence, failing to disclose

7  exculpatory evidence, and covering up this unconstitutional misconduct.  Upon

8  information and belief, Los Angeles policymakers were on notice of, but

9  deliberately indifferent to these unconstitutional customs, policies and practices.

10      169.   Upon information and belief, the LAPD, and its policymakers, as well

11  as the individual supervisors in this case, failed to train or supervise investigators to

12  ensure they complied with constitutional requirements in refraining from fabricating

13  evidence, using false testimony, or initiating malicious prosecutions; ensuring that

14  identification procedures were fair and are not unduly suggestive or coercive; and

15  disclosing all exculpatory and impeachment evidence.

16      170.   The LAPD, and its policymakers, as well as the individual supervisors

17  in this case, failed to supervise, discipline, and investigate allegations of misconduct

18  against LAPD officers and detectives, thereby creating a culture of misconduct and

19  emboldening officers and detectives to engage in misconduct.

20      171.   This unconstitutional failure to train and supervise is manifest in this

21  case in the practices of Zolkowski, who repeatedly failed to document interviews

22  and statements of witnesses.

23      172.   Zolkowski testified at Mr. Register's habeas hearing that his failure to

24  document exculpatory evidence, which directly facilitated the suppression of this

25  evidence, was done pursuant to LAPD training, custom, policy, and practice.

26      173.   For example, Zolkowski stated that reports would not be made when

27  officers provided detectives with information about a potential suspect.

28

174.   Zolkowski also stated that it was LAPD training, custom, policy, and practice that when an individual is listed as a witness in an original police report, no report should be made if that witness fails to identify a suspect when shown a photo array including the suspect's photo.

175.   The unconstitutional policies and practices directly and proximately caused Mr. Register's wrongful arrest, conviction, and incarceration.

176.   The misconduct of Defendants, all of whom are current or former employees of the LAPD, involved acts and/or omissions occurring with the scope of their employment with the LAPD.  Accordingly, the City of Los Angeles is responsible for paying any judgment, compromise, or settlement reached in this action.

## **DAMAGES**

177.   Defendants' actions deprived Kash Delano Register of his civil rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and the constitution and laws of the State of California.

178.   This action seeks damages for the period from April 10, 1979, through each and every year to the present. Mr. Register's liberty was curtailed upon his arrest on April 10, 1979.  He remained incarcerated until November 8, 2013.  The damages suffered by Mr. Register began in 1979 and continue to the present.

179.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Register to be falsely arrested, tried, wrongfully convicted, and incarcerated for three decades for a crime he did not commit.

180.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Register the following injuries and damages, which continue to date and will continue into the future:

personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

181. Mr. Register suffered a number of physical injuries while wrongfully incarcerated, including but not limited to having his neck slashed by another inmate, which required medical treatment and resulted in permanent scarring; suffering a hernia, which required a medical operation to correct and resulted in lingering ailments to this day; and developing high blood pressure.

182. As a result of his wrongful incarceration, Mr. Register was not present for the birth of his child, who was born on November 17, 1979. Mr. Register never developed a relationship with his child and never met his two grandchildren.

183. Prior to his incarceration, Mr. Register had a close relationship to his brother, Norman Register. Mr. Register was not permitted to attend his brother's funeral in 2008.

184. These injuries and damages to Mr. Register were foreseeable to Defendants at the time of their acts and omissions.

185. All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I

### 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, under the Fourteenth Amendment

186.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

187.   Defendants fabricated false evidence of Mr. Register's guilt and suppressed exculpatory and material evidence of Mr. Register's innocence, thereby violating Mr. Register's right to a fair trial and causing him to be deprived of his liberty without due process of law.

188.   Rather than conduct an adequate investigation, Defendants, individually and in concert, acted in a manner that shocks the conscience and followed through with the unlawful prosecution of Mr. Register, thereby depriving Mr. Register of his right not to be deprived of liberty without due process of law.

189.   Defendants fabricated evidence prior to trial, including Brenda Anderson and Elliot Singleton's identifications, and they did so knowingly or in reckless disregard for the truth.  This evidence was actually false; Mr. Register was never at the scene of Mr. Sasson's murder.  The use of this evidence at trial likely affected the jury's verdict.

a.      Defendants, individually and in concert, deliberately misquoted and misrepresented witness statements.  In particular, Defendants misrepresented the strength and circumstances of Brenda Anderson's identification of Mr. Register, and suppressed and misrepresented that Sharon Anderson had witnessed the incident and told them that Mr. Register was not the perpetrator.

b.      Defendants, individually and in concert, continued their investigation of Mr. Register despite the fact that they knew or should have known that he was innocent.  In particular, in addition to ignoring the lack of significant

physical evidence tying Mr. Register to the crime and ignoring Mr. Register's alibi, Defendants also ignored and suppressed the exculpatory statements of Sharon Anderson and Sheila Vanderkam.

c.     Defendants, individually and in concert, used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.  For example, Defendants pressured Brenda and Sharon to identify Mr. Register, and did so with threats of prosecution and promises of leniency.  Defendants sought to engage in a quid pro quo regarding the charges against Brenda and Sharon over the Avon theft.

d.     Defendants also used unduly suggestive identification procedures, coerced, and/or fabricated Brenda Anderson and Elliot Singleton's identifications of Mr. Register, irrespective of whether Mr. Register was in fact guilty.

190.   In addition, in an effort to secure Mr. Register's conviction without regard to his actual innocence, Defendants, individually and in concert, suppressed material, exculpatory information from Mr. Register, Mr. Register's defense counsel, and the prosecution in violation of the Constitution and *Brady v. Maryland*.

a.     Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Sharon Anderson's statement to LAPD detectives that the man she saw fleeing from the crime scene was not Mr. Register, which she reiterated even after explicit threats and attempts by the LAPD to coerce her into changing her story.

b.     Defendants, individually and in concert, never memorialized, intentionally suppressed, and/or recklessly failed to disclose Sheila Vanderkam's exculpatory statement to Defendant Zolkowski while Ms. Vanderkam was employed with the LAPD.  Defendant Zolkowski told Sheila

Vanderkam to "shhh," making it clear that she was to never again mention the exculpatory information.

c.    Defendants, individually and in concert, never memorialized, intentionally suppressed, and/or recklessly failed to disclose Brenda Anderson's prior criminal record, the fact that she was suspected of stealing the package of Avon products, or that she would not be prosecuted for the Avon theft in exchange for her testimony against Mr. Register.

d.    Defendants, individually and in concert, never memorialized, intentionally suppressed, and/or recklessly failed to disclose evidence that Elliot Singleton did not witness the incident and could not make a valid identification of Mr. Register.

191.   Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Mr. Register's defense.  Had Defendants' misconduct been disclosed, the evidence would have tended to prove Mr. Register's innocence, cast doubt on the entire police investigation and prosecution, and very likely created a different result at trial.

192.   Without knowing this exculpatory information, Mr. Register was convicted of a crime that he did not commit.

193.   The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Register's federally protected rights.  These acts were perpetrated while Officer Defendants were acting in their official capacities and under color of state law.

194.   As a direct and proximate result of Defendants' actions, Mr. Register was wrongly arrested, detained, charged with murder, informed he might face the

death penalty, prosecuted, convicted, sentenced, and incarcerated for over 34 years and suffered the other grievous injuries and damages set forth above.

## COUNT II

### 42 U.S.C. § 1983 Claim for Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments

195.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

196.   The criminal proceedings initiated against Mr. Register in April of 1979 have been pursued to a legal termination favorable to Mr. Register.  In particular, in November of 2013, the Superior Court of the State of California for the County of Los Angeles granted Mr. Register's petition for habeas corpus.  The charges against Mr. Register were subsequently dismissed by the Los Angeles District Attorney's office on December 13, 2013.

197.   The criminal proceedings initiated against Mr. Register in April of 1979 were brought without probable cause and without any reasonable belief in guilt.

198.   The false and tainted witness identifications failed to provide probable cause to initiate charges Mr. Register.  Defendants were aware of this fact but nonetheless caused Mr. Register to be charged, and subsequently, Defendants intentionally continued the prosecution against Mr. Register on the basis of fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby effecting a continuing seizure of Mr. Register in violation of his Fourth and Fourteenth Amendment rights.

199.   The criminal proceedings against Mr. Register were initiated on the basis of Defendants intentional and knowingly false accusations, fabrication of evidence, suppression of exculpatory evidence, and other malicious conduct.

200.   In falsely arresting Plaintiff despite the absence of probable cause to believe he had committed a crime, Defendants deprived Mr. Register of his liberty prior to the preliminary hearing, and in maliciously prosecuting plaintiff despite the absence of probable cause or existence of other evidence linking Mr. Register to the crimes, Defendants caused Mr. Register to suffer the indignity of public trial, the most severe continuing deprivation of liberty, over 34 years of emotional distress while serving prison time for a crime he did not commit, and the other injuries and damages set forth above.

201.   The criminal proceedings against Mr. Register were initiated with malice in that Defendants caused the charges against Mr. Register to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that was actively instrumental in causing the initiation of the legal proceedings against Mr. Register.

202.   Defendants' wrongful prosecution of Mr. Register was initiated with malice and without probable cause and was brought for the purpose of denying Mr. Register's constitutional rights, including his right to be free from unreasonable searches and seizures and his right to not be deprived of liberty without due process of law.

203.   As a direct and proximate result of Defendants' actions, Mr. Register was wrongly prosecuted, detained, and incarcerated for over 34 years and suffered the other grievous injuries and damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

204.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

205.   Defendants and others yet unknown agreed among themselves and others to act in concert to deprive Mr. Register of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and be free from illegal seizure.

206.   In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

a.   Acting in concert to suggest, coerce, and/or fabricate Brenda Anderson's identification of Mr. Register;

b.   Acting in concert to conceal that Brenda Anderson's identification had been tainted, and had been exchanged for leniency regarding the Avon theft;

c.   Acting in concert to fail to document and conceal Sharon Anderson's failure to identify, and affirmative statement that Mr. Register was not the perpetrator;

d.   Upon information and belief, acting in concert to suggest, coerce, and/or fabricate Eliot Singleton's false identification of Mr. Register;

e.   Acting in concert to suppress evidence demonstrating Mr. Register's innocence, including the exculpatory statements Sheila Vanderkam;

f.   Prior and subsequent to Mr. Register's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate leads pointing to other suspects; and

g.   Prior and subsequent to Mr. Register's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate evidence of Mr. Register's innocence.

207.   As a direct and proximate result of Defendants' overt acts, Mr. Register was deprived of his constitutional rights; wrongly prosecuted, detained, and

1  incarcerated for over 34 years; and subjected to other grievous injuries and damages

2  as set forth above.

### COUNT IV

**42 U.S.C. § 1983 Supervisory Liability Claim Against Defendants Bier, Hallanger, and John Does 1–10**

208.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

209.   Mr. Register's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Bier, Hallanger, and John Does 1–10, acting in their individual capacities and under color of law.

210.   Upon information and belief, Bier, Hallanger, and John Does 1–10 directly participated in the misconduct that resulted in Mr. Register's wrongful conviction, including but not limited to coercing, fabricating, or suggesting false identifications and suppressing exculpatory evidence.

211.   Bier, Hallanger, and John Does 1–10 knowingly refused to terminate the wrongful prosecution of Mr. Register, which, upon information and belief, they knew or should have known had been initiated based on the coerced, fabricated, or suggested identifications and in spite of suppressed exculpatory information.  As a result Bier, Hallanger, and John Does 1–10 knew or reasonably should have known that Mr. Register's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

212.   Bier, Hallanger, and John Does 1–10 culpably failed to adequately train, supervise, an/or control their subordinates, including Zolkowski and Kingsford, who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information.

34

213.   Bier, Hallanger, and John Does 1–10 violated Mr. Register's constitutional rights by acquiescing in the deprivation of Mr. Register's constitutional rights by their subordinates, including Zolkowski and Kingsford, and by generally showing a reckless or callous indifference to Mr. Register's rights.

214.   Bier, Hallanger, and John Does 1–10's failure to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Mr. Register's rights, encouraged and permitted their subordinates to fabricate evidence and to fail to document and to disclose exculpatory evidence.

215.   The actions and omissions of Defendants Bier, Hallanger, and John Does 1–10, in their individual capacities, caused Mr. Register to suffer the constitutional deprivations and grievous personal injuries and damages described above.

## COUNT V

**42 U.S.C. § 1983 *Monell* Claim Against the City of Los Angeles, for Failure to Train, Supervise, and/or Discipline in Constitutionally Adequate Investigation Techniques, Identification Procedures, and/or *Brady* duties**

216.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

217.   The City of Los Angeles, by and through its policymakers, created and maintained a custom, policy and/or practice of failing to train, supervise, and/or discipline its employees and agents, including Defendants, regarding constitutionally adequate investigation techniques.

218.   The City of Los Angeles, by and through its policymakers, created and maintained a custom, policy and/or practice of failing to train, supervise, and/or discipline its employees and agents, including Defendants, regarding

1 | constitutionally proper identification procedures and to ensure that unreliable,

2 | discredited, and improper identification techniques were not utilized.

3 |     219.   The City of Los Angeles, by and through its policymakers, created and

4 | maintained a custom, policy and/or practice of failing to train, supervise, and/or

5 | discipline its employees and agents, including Defendants, regarding their

6 | obligations to document and disclose exculpatory evidence pursuant to their *Brady*

7 | obligations.

8 |     220.   Moreover, Zolkowski's testimony at Mr. Register's habeas hearing

9 | firmly establishes that Defendants' failure to document exculpatory evidence, which

10 | directly facilitated the suppression of exculpatory evidence in this case, was done

11 | pursuant to LAPD training, custom, policy, and practice.

12 |     221.   These unconstitutional customs, policies, and practices of the City of

13 | Los Angeles proximately and directly caused Mr. Register's injuries, including his

14 | false arrest, illegal confinement, unfair trial, wrongful conviction, and other

15 | damages described above.

16 |     222.   These unconstitutional customs, policies, and practices of the City of

17 | Los Angeles are further documented by Dr. Fyfe's study of the ineffectiveness of

18 | complaints made against the LAPD between June 1979 and June 1981.  The Fyfe

19 | study found that complaints brought against officers by the LAPD were almost

20 | always sustained, while citizen complaints were rarely sustained.  Indeed, Fyfe

21 | noted that pursuant to the LAPD citizen complaint procedure it is "almost

22 | impossible for a police officer to suffer discipline as a result of a complaint lodged

23 | by a citizen."

24 |     223.   The July 1991 Christopher Commission Report further documents the

25 | unconstitutional policies permeating the LAPD. The Christopher Commission

26 | determined that the repetitive use of excessive force against the public and the

27 | persistent disregard of written guidelines was, at its heart, "a management problem."

28 |

The Report concluded that the LAPD's failure to address these problems evidenced a significant breakdown in the management and leadership of the LAPD.

224.   The Christopher Commission found that less than 2 percent of allegations of excessive force were sustained in part because "the complaint system is skewed against complainants."  The majority of investigations at that time were done by division staff, not the Internal Affairs Division; the Commission found this to be seriously problematic because these staff often failed even to interview or identify witnesses.

225.   The Report concluded that "the greatest single barrier to the effective investigation and adjudication of complaints is the officers' unwritten code of silence: an officer does not provide adverse information against a fellow officer. While loyalty and support are necessary qualities, they cannot justify the violation of an officer's public responsibilities."

226.   Similarly, the May 1997 Fuhrman Report concluded that LAPD command officers are not held accountable when egregious or systemic misconduct is found within a command.  In describing the LAPD Manual, the report states, "[N]owhere does it spell out a command officer's responsibility to deal with systemic misconduct and to establish sufficient detection systems to ensure command awareness of activities which have the potential to become systemic."

227.   The Fuhrman Report found that victims frequently were not interviewed during internal investigations of the use of force, that supervisors who were actively involved in use of force incidents conducted the investigation into the incident, and that record-keeping was so poor that it needed to be reorganized.

228.   The unconstitutional customs, policies, patterns, and practices of the City of Los Angles have caused numerous individuals to be wrongfully convicted, thereby permitting the true perpetrators to go free.  In addition to Mr. Register, individuals wrongfully convicted for crimes committed during the 1970s and 1980s

include:

a.      *Clarence Chance & Benny Powell—Convicted 1975, Exonerated 1992*.
On December 12, 1973, an off-duty LA County Sheriff's Deputy was shot and killed two men.  Police focused on two men who lived in the neighborhood: Benny Powell and Clarence Chance.  Although an 11-year-old witness could not initially identify Mr. Powell or Mr. Chance as the shooters, and neither man fit the witness's first description, after repeated questioning and coercion, the witness identified Mr. Chance.  Following this false identification, police produced additional witnesses falsely connecting Mr. Powell and Mr. Chance to the crime.  In April 1975, a jury convicted both men of first-degree murder and they were sentenced to life in prison.  A subsequent investigation revealed that the witnesses had identified Mr. Powell and Mr. Chance because of intense police pressure and threats.  In March 1992, after the District Attorney's Office agreed that police had concealed evidence, the habeas petitions were granted, the convictions were overturned, and the charges were dismissed.

b.      *Adam Miranda—Convicted 1983, Exonerated 2009*.
On September 12, 1980, a drug dealer named Robert Hosey was chased down and stabbed to death in Los Angeles over a drug deal gone bad.  At a preliminary hearing, a witness falsely testified that Adam Miranda had committed the stabbing.  This was the only evidence against Mr. Miranda.  Nearly 20 years later, Mr. Miranda's attorneys uncovered suppressed evidence that the witness had told at least five other inmates that he, not Mr. Miranda, had murdered Hosey.  Neither the police, nor the prosecution disclosed this evidence to the defense.

c.      *Willie Earl Green—Convicted 1984, Exonerated 2008*.
In August 1983, Denise Walker was shot and killed during a robbery in the

LA home of her boyfriend.  Based on the boyfriend's identification, a jury convicted Willie Earl Green of murder and armed robbery.  Mr. Green was sentenced to 33-years-to-life in prison.  In 2004, during a reinvestigation by Centurion Ministries, Ms. Walker's boyfriend recanted his testimony, which would eventually result in Mr. Green's exoneration and release. Upon information and belief, this misidentification was suggested, fabricated, or coerced by the LAPD officers involved.

d. _Bruce Lisker—Convicted 1984, Exonerated 2008._

On March 10, 1983, 66-year-old Dorka Lisker was beaten with a Little League trophy and stabbed in the back with a pair of steak knives in her LA home.  Paramedics were summoned to the scene by Dorka's adopted son, Mr. Bruce Lisker.  Mr. Lisker, who was 17-years-old, claimed that he called the paramedics after seeing his mother's body through a window, but the police immediately suspected that he was the one who had committed the crime. Detective Monsue told prosecutors that the evidence against Mr. Lisker included blood spatter on his clothes, a bloody footprint in the bathroom, and the absence of nearly $150 from Ms. Lisker.  A jailhouse informant who met Mr. Lisker in pre-trial detention struck a deal with prosecutors to testify that Mr. Lisker had confessed to murdering his mother.  In exchange, the informant received a reduction of his own sentence.  On November 21, 1985, Mr. Lisker was convicted of second-degree murder and sentenced to 16 years to life.  A subsequent reinvestigation disclosed that Detective Monsue had never sent the clothing that was allegedly blood-spattered or the shoe print for testing.  When these items finally were tested, it was determined Monsue's assertions were false—there was no blood on the clothing and the shoe print did not match Mr. Lisker's.  In 2009, a judge vacated Mr. Lisker's conviction on the grounds that it was based on false evidence and inadequate legal

1    defense, and five days later Mr. Lisker was released from prison.

2    e.      _Geronimo Pratt—Convicted 1972, Exonerated 1999_.

3    In December 1968, a couple was robbed at gunpoint by two black men.  The

4    woman was shot and killed, the man survived.  Geronimo Pratt, a known

5    Black Panther activist, was arrested on false information.  Mr. Pratt did not

6    commit the crime and in fact was in Oakland at the time of the murder.

7    Although innocent, Mr. Pratt was identified by the survivor of the robbery

8    and another witness.  Upon information and belief, these identifications were

9    coerced, fabricated, or suggested.  A jury convicted Mr. Pratt of first-degree

10   murder, armed robbery and felony assault in July 1972, and he was sentenced

11   to 25-years-to-life in prison.  Mr. Pratt was exonerated in 1999 after an

12   investigation revealed that the LAPD had concealed exculpatory evidence,

13   including FBI wiretaps that would have established Mr. Pratt's alibi.

14   f.      _Timothy Atkins & Ricky Evans—Convicted 1987, Exonerated 2007_.

15   On January 1, 1985, Vincente Gonzalez was murdered when two men

16   attempted to carjack him and his wife.  Shortly after the murder, a woman

17   named Denise Powell told police that two street gang members that she knew,

18   Timothy Atkins, 17, and Ricky Evans had bragged that they had "offed" Mr.

19   Gonzalez.  Mr. Evans was killed in jail awaiting trial and Mr. Atkins was

20   convicted.  In 2001, Atkins, having lost his appeals, wrote a letter to the

21   California Innocence Project at California Western Law School in San Diego.

22   In February 2005, Wendy Koen, a second-year law student located Powell at

23   a drug rehab center.  Powell told Ms. Koen that she had lied, and when police

24   were tipped off that Ms. Powell was lying and questioned her, Ms. Powell

25   made up a story because she was using cocaine at the time and police

26   threatened to charge her if she didn't provide information regarding the

27   murder.  Mr. Atkins was released on February 9, 2007.  The LA District

28

1    Attorney's Office dismissed the charges on April 6, 2007.

2          g.      *Harold Hall—Convicted 1990, Exonerated 1990*.

3    In June 1985, Nola Duncan and her brother David Rainey were murdered in

4    LA.  After receiving a tip from an informant who produced notes allegedly

5    linking Harold Hall to the crime, LAPD interrogated Mr. Hall for 17 hours

6    without a break or access to an attorney.  As a result of these interrogation

7    tactics, Mr. Hall eventually confessed, but later recanted.  In April 1990, a

8    jury convicted Mr. Hall of murdering Duncan and Rainey, and of raping

9    Duncan, and he was sentenced to life without parole.  Mr. Hall's conviction

10   was eventually overturned when the informant admitted that he had altered

11   the notes in exchange for leniency on an unrelated murder charge,

12   information that was never disclosed to the defense.

13         h.      *Arthur Grajeda & Senon Grajeda—Convicted 1987, Exonerated 1993*.

14   On June 4, 1986, 22-year-old Ralph Morales, a reputed cocaine dealer, was

15   fatally shot.  Two weeks after the murder, a parole officer called detectives

16   and said one of her parolees, 26-year-old Edward Moran, said he knew

17   something about the shooting, but did not want to go to police.  Police went to

18   Moran's home, where they found several weapons and PCP; they arrested

19   Moran on a parole violation.  Moran then told police that Morales was killed

20   by 19-year-old Arthur Grajeda and his 31-year-old brother, Senon.  Less than

21   two weeks after testifying at Arthur and Senon's trial, Moran pleaded guilty

22   to possession of PCP and the gun charges against him were dismissed.  He

23   was sentenced to one year in jail and then released based on time served.  In

24   June 1990, lawyers for Arthur Grajeda sought a new trial because it had never

25   been disclosed that, in exchange for his testimony, Moran was promised a

26   reduced sentence on the charges pending against him and was allowed to

27   leave jail on a furlough.  The brothers were eventually acquitted in 1993.

28

i. *Gerald Atlas & Andre Taylor—Convicted 1990, Exonerated 1998.* On December 27, 1989, Andre Marshall was shot twice in the head and once in the abdomen by two gunmen.  Mr. Marshall's girlfriend, Ms. Galvez, was present at the scene.  After police stopped a white Cadillac with five young black men near the scene of the crime, officers reported that Ms. Galvez identified Gerald Atlas and Andre Taylor as the shooters.  Following their wrongful convictions, a subsequent reinvestigation revealed that the prosecution had concealed Ms. Galvez's prior felony convictions.  In 1998, Mr. Atlas and Mr. Taylor were granted a new trial and the charges against them were dismissed.

## COUNT VI

### Claim under California Civil Code § 51.2 Against
### Defendants Zolkowski and Kingsford

229.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

230.   Zolkowski and Kingsford interfered or attempted to interfere with Mr. Register's rights secured by the U.S. and California constitution and laws. These constitutional violations were accompanied by threats, intimidation, or coercion.

231.   For example, Zolkowski and Kingsford, after ostensibly bringing Brenda and Sharon Anderson to the station to discuss the Avon theft, used threats, intimidation, and/or coercion in an attempt to obtain Brenda and Sharon Anderson's identification of Mr. Register.

232.   When Sheila Vanderkam reported exculpatory information regarding Mr. Register to her superior at the LAPD, Defendant Zolkowski, Zolkwoski, by means of threats, intimidation, and/or coercion, ordered Ms. Vanderkam to remain silent and never discuss this exculpatory information with anyone.

42

233.   As a result Zolkowski's threats, intimidation, and/or coercion, Ms. Vanderkam, a young, black, female employee reporting directly to Zolkowski and other LAPD detectives, felt fear and felt compelled to follow Zolkowski's orders not to discuss this information with anyone.

234.   As a direct and proximate result of Zolkowski and Kingsford's threats, intimidation, and/or coercion, Mr. Register was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over 34 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT VII

### Claim under California State Law, Cal. Gov. Code § 815.2, for Respondeat Superior and Vicarious Liability against the City of Los Angeles

235.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

236.   Mr. Register suffered the aforementioned injuries as a proximate result of the misconduct of the individual Officer Defendants.

237.   During all relevant times, Defendants were employees of the LAPD and the City of Los Angeles.

238.   The acts and omissions of Defendants that proximately caused Mr. Register's injuries were within the scope of Defendants' employment with the LAPD and the City of Los Angeles.

## JURY DEMAND

239.   Pursuant to the Seventh Amendment of the United States Constitution, Mr. Register requests a jury trial on all issues and claims set forth in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Kash Delano Register respectfully requests:

        a.     A trial by jury on each of the Plaintiff's claims;

        b.     That the Court award compensatory damages to Plaintiff and against Officer Defendants, jointly and severally, in an amount to be determined at trial;

        c.     That the Court award punitive damages to Plaintiff, and against Defendants, in an amount to be determined at trial, in order to deter such conduct by Officer Defendants in the future;

        d.     For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

        e.     For any and all other relief to which he may be entitled.

1

2  DATED: June 13, 2014

3

4

5                              By          /s/ Barry Scheck

6                                          BARRY SCHECK

7

8                              Barry Scheck, State Bar No. 62646

9                              Nick Brustin,* NY Bar No. 2844405

10                             Anna Benvenutti Hoffmann,* NY Bar No. 4412011

11                             Farhang Heydari,* NY Bar No. 5065693

12                             NEUFELD SCHECK & BRUSTIN, LLP

13                             *Awaiting Admission Pro Hac Vice

14

15

16                             Kevin LaHue, State Bar No. 237556
                               KAYE, MCLANE, BEDNARSKI & LITT, LLP
17

18                             Attorneys for Plaintiff

19                             KASH DELANO REGISTER

20

21

22

23

24

25

26

27

28